The argument next in Schurg v. United States Mr. McClain, whenever you're ready. Yes, thank you very much, Your Honor. Good morning, Your Honors. My name is Chris McClain. I represent the plaintiffs in this action. We actually have 12 clients, and as the Court has recognized, that there are perhaps two defined groups of clients. Many of our clients resided in the McIntosh Manor subdivision near the Lolo Peak Fire in 2017. And then Mr. O'Grady actually owned five sections of undeveloped property, not far away, but around the corner and on the north side of the Lolo Peak Fire. And the government's conduct in dealing with those two separate groups of people was substantially different. So when we look at those two categories of clients, I'd like to make sure we maintain that distinction. This case that we have brought, on behalf of all our clients, claims that the United States Forest Service failed to notify the McIntosh Manor plaintiffs of the long-planned firing operations that they had determined they were going to do near their property. With respect to Mr. O'Grady, we're also claiming that the United States Forest Service failed to notify him that they were, in fact, going to light his property on fire with firing operations, and that these plans were made long before they actually took those measures. It's a failure-to-notify case, and we rely substantially on this Court's decision in Green v. United States for our legal authority for bringing this action. The record in this case is large, it's detailed, it's voluminous, and we have tried to summarize it in an efficient fashion in our briefs, for your consideration. We received the Lolo Peak Fire 2017, the government's entire firefighting file, and we were able to pull through those documents and obtain the materials that we have submitted to the whether the plaintiff's claims withstand the District Court's decision that the United States government is shielded from these claims by the discretionary function exception to the Federal Tort Claims Act. Let me ask you to expound on Green, because there the Court is talking about whether there is a precise manner or a precise direction. And as I understand it, there it was a total failure-to-notify, and here, in a way, I read the claim as disagreeing with the way the notification came about. Is that wrong? Your Honor, with all due respect, I think you're wrong about that assessment of the notifications here. With respect to Mr. O'Grady, and that's why I kind of set him aside. Right. He lived in Colorado. He was never notified by the United States Forest Service about any of their planned operations. He was not notified once they began the firing operations. Was that information available on the fire notification page? It was not. Okay. It was not. That's why he's separate from the others. Yeah. Yeah. It was. So I'm really focusing on the larger group where the notifications went out, but they were not happy with the nature of the notifications. And again, we have a different perspective. Okay. So tell me where... Because that's how I read the brief, so tell me where I'm wrong on how I interpret your brief. You know, as we describe in our brief, the factual scenario here is the Forest Service's own documents, these ICS 209s that they produced every day and sent to headquarters about how the fire was going, what they needed to do to fight the fire. They started recognizing in late July 2017 and early August that this fire had the propensity to reach the McIntosh Manor. They started talking about that. And they actually had these maps, the M-A-P-S, which are lines drawn on the plans and basically is a trigger point where if a fire gets here, we have to do this. And there were two IMTs in the case, which also makes it a little confusing. The Ponson IMT was early in the fire. They left August 4th in favor of the Livingston team. The Livingston team came in and they were there until August 16th when this fire in fact blew up and it changed back to Ponson. So we've got these IMTs. But I guess my point with respect to mentioning the Ponson team and the Livingston team is that the map, the plan that was decided and determined by the Forest Service bosses in these decisional documents, the August 4th decisional documents, directed the Forest Service officials to consult with private landowners if the firing operations had a high propensity of being conducted near or on their property. That's August 4th. Meanwhile, the Ponson liaison officer had actually produced this matrix that's in the record that shows, you know, if this fire hits Map 5, we need to consider and have a discussion about whether to warn the folks in McIntosh Manor that they may have to evacuate. That was back in early August when that guy made that determination. And there's an ICS 209 that we recite in our briefs that says, the fire has crossed Map 5, early August 2017. Yet this liaison officer testified, we didn't have any discussions with anybody about whether to warn the McIntosh Manor plaintiffs. And they were giving warnings to other folks, other subdivisions in the area, but for whatever reason they didn't give one to the McIntosh Manor. And this is early August of 2017. So, and it's important that, you know, we have several pieces of evidence that kind of describe and elucidate the government's failure to notify in this case, because we have the... Go ahead. You know, you're in a wide-ranging fire here, okay? And now you're in a wide-ranging argument, so I'm trying to pin it down. There's a lot of stuff here. Right. There is a lot. So we have the early, you know, the early August, and then they have the public notifications. When you get closer to what happened, when they start these burnout operations in, I would say, mid-August, August 17, at that point, was there any anticipation that the fire would reach the McIntosh Manor? Yeah. Absolutely. And what do we look to for that? Absolutely. July 31 and August 1, 2017, the ICS-209, which is in the record at 5 ER 1019 through 1025, and 6 ER 1244, this is the Forest Service Statements to Headquarters, the fire has reached Map 5, Lantern Ridge. This triggers nine recommended actions, including review and update evacuation plan, and three, notify cooperators and stakeholders. We follow that with describing for the court this matrix created by the U.S. Forest Service liaison officer, stated that if the fire crossed Map 5, Lantern Ridge, that should have triggered a discussion between the forest officials about whether evacuation warnings should be given to residents of McIntosh Manor. In the record, that is found at 2 ER 150 through 154, and 5 ER 1018. According to the Forest Service liaison officer who created this matrix, no discussion about issuing an evac warning to the McIntosh Manor residents occurred after the Livingston IMT arrived at the Lolo Peak fire on August 4, 2017. Then on August 1st and 2nd, 2017, another ICS-209 described 201 residents issued evac warnings per actions recommended when Map 5 was compromised. That's at 6 ER 1245, but McIntosh Manor folks were not amongst those people giving evac warnings. So, this is early August to answer your question. But, you know, we're kind of between cases because in green they don't give any warnings, and it's Esquivel, Esquivel, where they're like, do the best possible thing, it's like person by person, in person, and this is somewhere in between because of the electronic notices, so how do you reconcile that they had an obligation to do more than that? Where's the mandatory language? I'm trying to initially lay the groundwork for the Forest Service's knowledge that the McIntosh Manor subdivision was in trouble. It was in trouble. It was in danger. Early August 2017. Let's take that as a given, but where is the mandatory language that mandates what the Forest Service must do in that regard? That's what I'm looking for. It is at 3 ER 366. This is the August 3, 2017, Lolo Peak Joint Leaders Intent. This is the official document that the Forest Service bosses put out and say, this is what you must do in fighting the Lolo Peak Fire of 2017. It's not a manual. It's not some other regulation. It is directly a decisional document. That's what they call it, for the Lolo Peak Fire of 2017. It says, from the boss, it is my expectation that you read and follow the decision documentation. The decision documentation. It's a decision that's been made, outlined in the WFDSS, the incident requirements, incident and objectives. This is at 3 ER 366. And then the boss states, if there is a deviation from this decisional document, a new decision will need to be completed. That's how important these directives are. That's at 3 ER 367. On August 4, 2017, which is 3 ER 325, this is the Lolo Peak Incident Decision Document. And I wanted to tell you that I miscited this in my brief. We have a miscite on this particular document. It is 3 ER 325, which is correctly stated in our brief. But we cited 6 ER differently than it should be. It should be 6 ER 1251 through 1252. And I believe that's the depositional testimony by one of our officers about that. But the decision document is... It's a decision document. But the language on page 325 is still just the consult with private landowners? Is that the... That's right. But it doesn't say any particular means of consultation or any particular timing of consultation, does it? No, it does not. It's pretty clear language. Pretty plain meaning, I think. It says... It directs the managers under the heading, quote, incident requirements to consult with private landowners and local fire district and authorities if fire suppression activities... Right. But if it doesn't provide direction as to what type of consultation is supposed to happen, how it's supposed to happen, doesn't that leave the fire service with discretion? No. No, not in our view. I mean, it's pretty clear language to us when you have a property owner like Brian O'Grady. And they were talking to Brian O'Grady's neighbors. That's of the record. There were other ranchers in the area they were having direct communications with. And the direction to consult means you have to do something, right? For O'Grady, they did nothing. There was no communication with Mr. O'Grady at all. Even though they had his phone number in their records. He lives in Colorado, right? Yeah, he does. Yeah. And he's got a phone, and they had his number. And all they had to do was pick up the phone and say, hey, Mr. O'Grady, that fire's coming close to your property. We see it coming down. It's August 4th. You may want to talk to us about how we're going to handle it. And as to Mr. O'Grady, were there any updates regarding his property on the NCWEB? I don't know if I'm pronouncing it correctly. There was, you know, we challenged the government throughout this litigation to show us in their pile of public communications, and it is a large pile. One time when they contacted Mr. O'Grady, one piece of information that he could have read on the NCWEB about his property. There are none. There are zero directed to Mr. O'Grady or saying, we're going to light fires, we're going to conduct firing operations, even in that area. In the government's brief, they try to- You mean that there are none that specifically say, Mr. O'Grady, we're going to be near your property, or are there no communications regarding the area of his property? Again, we challenged the government and they tried to respond in their brief. And what they told this court after being challenged on this issue, they came up with two posts, two posts, and they cite these as their information to not only Mr. O'Grady, but McIntosh Manor. They cite an NCWEB post on August 17th at 1245, wildfire conditions present an immediate threat to people and homes. Secondly, they say another post, NCWEB post on August 17th at 830 a.m., by the afternoon, the firefighters expect to be using aerial and hand ignition for burnout operations to on the northeast side of the fire. The northeast side of the fire is where Mr. O'Grady's property is. And there's a lot of property up there and many landowners. And they were communicating with many of those landowners, but not him. Even though they had his phone number and a liaison officer and an IMT boss. And when we asked him about depositions, it was the classic finger pointing of, well, geez, Mr. IMT boss, why didn't you call this guy? Well, I thought somebody was going to call him. And then you talk to that guy and you say, well, nobody told me to call him. And it was just, you know, it was a error. It was a mistake. It was negligence. And that's why we're here. May I ask, this is, I think, not really part of the stage of the appeal, but just to just have curiosity, I mean, what would your, what were Mr. O'Grady's damages from the failure to notify him? I mean, he was in Colorado. So if he got notice or didn't get notice, what would he, how would it have helped him? Well, it kind of applies to everybody, Mr. O'Grady and the McIntosh Manor plaintiffs, because by August 4th of 2017, the Forest Service is documenting this fire burning near O'Grady's property, burning onto his property. If they had called him and said, this fire is on your property, it looks like we're going to have to do something. He could have said, all right, I'm going to do something. I'm going to hire a fire crew. I'm going to buy more insurance. I'm going to take steps. I'm going to remove my personal property. And the same thing that the McIntosh Manor folks explain is that, you know, and it's what the court in the concurring opinion in Green talked about, is that the government's failure to notify deprived these folks of an opportunity to help themselves, to protect their property, to move their stuff out of their house before it was panic time on August 16th. And the government knew by August 10th of 2017. They had detailed plans that we've included in this record showing exactly where they were going to drop the fire, exactly where they're going to light hand lines, August 10th. And they didn't tell Mr. O'Grady about it, and they didn't tell the McIntosh Manor about it. They didn't consult with them as required by the decisional documents governing the Lolo Peak fire in 2017. That is a problem. And that is why Green applies here, is that the Forest Service knew the danger was approaching our clients, and they failed to notify them. And if they had only notified them as these folks testified in their deposition, they could have taken steps to remove their private property, to dig some hand lines, to get a bulldozer. And they talked about those things specifically in their depositions. They could have taken some action. And they had a couple weeks' time to do it if they'd only been notified by the Forest Service. Do you want to reserve the rest of your time? I would, Your Honors. Thank you very much. Thank you. All right. We'll hear from the government now. May it please the Court. Good morning, Your Honors. John Newman, Assistant United States Attorney from the District of Montana. To address a number of the points that Mr. McClain made in his opening argument there, I'd like to talk about the structure of the August 4, 2017, incident decision that's at ER 304 to 352. And I want to talk about how firefighting teams use this type of document during a fire, because that's important here. The decision is broken up into a number of sections. So there's a section about current conditions, predicted conditions. There's a rationale section. There's an objective section, which is the section that contains the consulting language that counsel just spoke of. And I'll get to that in a moment. But the meat of the decision is this course of action section, beginning at ER 331, and taking up about half of the decision. The reason the course of action section is so important is because that section outlines options for actually fighting the fire and protecting the public. And it's dependent on fire behavior. And that point is really important, the dependency on fire behavior, because this is what's known as a strategic plan. So it outlines these potential options for the firefighting teams to take if certain contingencies come to pass. And so because the actions are contingent on certain occurrences, and they're contingent on the firefighting team's observations, the whole sort of essence of the course of action section is up to the discretion of the firefighters. And that's clear in the objective section, sort of right at the outset there under recommended approach to implementation. That's on 331, ER 331. That section says all actions listed are considerations and not cast in concrete. It says that firefighters are not locked into specific actions. And it says operations personnel will ultimately determine what is needed to fight the fire. So the bottom line is here, wildfires can be chaotic. Things change quickly. And so these management action points that are in the course of action section, they give firefighters options to consider if the fire gets to a certain geographic location. And if you look at the management action points, they're actually a line on a map. It's like a threshold. If the fire gets to that line, then the management action points cue firefighters to maybe consider certain things. So that way they don't have to come up with these options on the fly while they're fighting the fire. Now, it's important to consider that if the fire never reaches a particular management action point, then the firefighters aren't going to take those actions. And a perfect example of that is management action point number eight. That's at ER 342 to 343. Management action point number eight recommended considering certain actions if the fire jumped US Highway 12, which is a highway on the northern edge of the fire area. And if the fire jumped US Highway 12, management action point eight suggested considering certain options. But the fire never jumped the highway. So firefighters never did those things because it wouldn't have made any sense. So the bottom line is that firefighters kind of decide what to do depending on what the fire is doing. And in that sense, the whole- If I could just go to this language on ER 325 stating that fire service has to consult with private land owners. Yeah. I mean, if there was no sort of personal communication with Mr. O'Grady or the McIntosh Manor plaintiffs, how was their consultation and fulfillment of this requirement? Sure. First of all, I just want to address whether that consultation language, if I may, whether that consultation language is sort of prescriptive. And for two reasons, it's not. First, going all the way back to Valdez, perhaps even earlier. But Valdez in 1995, the Miller case, of course, in 1998. I believe the same language was in Terbush in 2008, Lamb in 2020. Decisions all in between there as well. The court has held that isolated terms do not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion. So it's all about sort of the totality of the document that's at issue here. If we're talking about a statute regulation or established governmental policy under the discretionary function exception. So the purpose of this incident decision, the August 4th incident decision, is to fight the fire. That's what its primary purpose is to provide these sort of current and future conditions and figure out the best way to fight the fire. So the overriding purpose, the broader goal of the incident decision is suppression. So based on that, considering that overriding goal, this court's decisions would counsel against looking to isolated terms like consult. The other reason why consult doesn't sort of evade the discretionary function exception at step one is because it doesn't meet this court's standard of eliminating discretion by prescribing a mandatory and specific course of action. And for that, I would point to Miller again. So in Miller, the court was looking at the applicable forest plan, the code of federal regulations, Oregon state law, and provisions in the Forest Service Manual. And the court, looking at those sources, said, hey, these sources actually provide a set of requirements related to suppression. And the word requirements is in there. And nevertheless, the court in Miller said, but they don't eliminate discretion because they don't tell firefighters how to fight the fire. So that consult language in the objectives section is similar in that regard. So I apologize. One of your honors mentioned earlier, so how does consult actually, how does it tell firefighters how to consult? How does that sentence actually tell firefighters how to consult? And the answer is it doesn't. There's a reference in there to a probability of fire suppression operations affecting private land. But who determines a high probability? The firefighters do. And what if there is a 0% probability of fire suppression operations affecting private land at 8 a.m. and then at noon, the fire blows up, as we see in California, fires consuming tens of thousands of acres a day. What if there's a 90% chance of fire suppression operations affecting private property at noon? And so what are the firefighting teams supposed to do? Are they supposed to consult by calling? Are they supposed to consult by going door to door? Or in this case, to answer your question now, to get around to it, can they consult by setting up channels for two-way communications? And I think that term consult is sort of interesting here because consult implies this two-way communication. It's not, the incident decision doesn't say broadcast, it doesn't say, it's a very specific term. So consultation here was available and occurred in various ways. There was a hotline that was set up for people to call. There was an email address that questions could be directed to. There were in-person meetings all the time. There were Facebook events, live stream Facebook events, where there was a chat set up and people could ask questions. There were these information kiosks, one of which was set up at probably the busiest intersection in this 90-mile long valley in western Montana. They put this trailer there with big posters that said, Lolo Peak Fire Information. There was another, a yurt that they had set up about 10 miles south of there. Lots of chances for people to consult with the team. And when private property owners were present and firefighters happened to run into these folks, yes, there was face-to-face consultation. But oftentimes what you saw there is a present landowner with improvements on their property. Mr. O'Grady was not present. He had no improvements on his property. Looking up at the side of the mountain, you can't tell where Forest Service property is and where private property is. And so the teams had set up these modalities for consultation and therefore consultation occurred. Did it occur, as the court asked a moment ago, did it occur in the way that Mr. O'Grady would have preferred and all of the appellants would have preferred? Apparently not. But that doesn't mean that it didn't occur. So, looking at the two groups separately, it seemed on the McIntosh Fire that it actually, I suppose, it expanded itself onto their property within a day. Yes. But up to that point, there had been the InfoWeb or InsoWeb, what do you call it? InsoWeb. InsoWeb, like incident web. Incident web. InsoWeb. Right. On that morning, are there documents that show that it's likely to jump and go onto the McIntosh property? Oh, absolutely not. And the timeline is very important here because it's this idea of anticipation and whether or not the teams knew that this was going to happen. So the fire was burning several miles away from the McIntosh Manor subdivision as of the morning of August 16th, 2017. And there was sort of a pre-cold front that came through before this much stronger cold front that was anticipated for August 18th, 2017. So on August 16th, things start to really blow up. There was a 20,000 foot pyrocumulus smoke cloud that could be seen pretty much everywhere. And so on the 16th, this fire runs about three or four miles and consumes about 4,000 acres. So it goes from being miles away from McIntosh Manor to getting closer. And it was at this point, the afternoon of the 16th, that the fire crossed management action point number seven. Now, if the court were to look at the incident decision and look at management action point five, six, and seven, there is no mention whatsoever of McIntosh Manor subdivision until management action point number seven. That's the first time that the incident decision even mentions that subdivision. And it's because that subdivision is on the far eastern edge of this sort of, there's like a fire boundary that the team set. And it's like, you know, worst case scenario, where could this fire potentially go? So McIntosh Manor is all the way on the east side of that worst case scenario boundary. So when the fire crosses management action point number five, four or five miles away, that didn't trigger any action with respect to McIntosh Manor. When it crossed management action point number six, same thing. It was still far away. It was only when it crossed management action point number seven that there's any mention whatsoever of McIntosh Manor. The fire crosses management action point number seven in the afternoon of August 16th, 2017, at four or five o'clock in the afternoon. And it's at that point that the teams realize, okay, we're getting close to some of these developments on that eastern edge of the worst case scenario boundary. The firefighting teams meet that night, on the night of August 16th, and they talk about, you know, we had a bad day. And it's supposed to get even worse on the 18th. So what are we going to do? Well, they decide that they're going to do this firing operation, not on appellants property like occurred in Greene and in Esquivel, but the firing operation was planned to be inside the containment line that had been dug to the west of the McIntosh Manor subdivision. I know we're talking about a lot of different directions here at this point. So the intent was to ignite this firing operation inside the containment line and have it burn west to create a bigger buffer. They make this decision to do that on the night of the 16th, because the 18th is going to be bad. And they decide to do it the next morning on the 17th. Right after they decide to do it, they evacuate all of those subdivisions on the far eastern boundary because, A, the fire had crossed management action point number seven, which called for considering evacuations regardless of this firing operation. But the firing operation was a contributing factor, certainly, in them deciding to evacuate those properties. And so then on the 17th, they update INCIWEB at eight o'clock in the morning. They say, you've all been evacuated, folks, along Highway 93, so this shouldn't really affect you. You shouldn't be at your property. But we're going to conduct this firing operation on the 17th, and this is what we're hoping to do. They do that firing operation throughout the day on the 17th. Various things sort of delayed them and whatnot because it's a wildfire and it was getting kind of crazy. And then, to come around to your question, then when they conduct that firing operation, the fire jumps the containment line in that one spot and it heads into the subdivision. So as to Mr. O'Grady, there's one INCIWEB posting that would relate to the fact that they're going to do these firing operations near his property? So I disagree with Council's take on what the posts say. There's mention of the potential need for using firing operations to slowly bring the fire down the hill in multiple postings. And that was also mentioned in public meetings and all those other communication consultation modalities I mentioned a second ago. And I think at this point, it's important to, I think there's this sort of understanding of firing operations as we're introducing fire to the landscape and it sort of heightens it. I don't know, it seems somehow like, I don't know, it takes on sort of a different sort of tenor than the natural fire coming out to somebody's property. Firing operations are a form of suppression because sometimes you just can't actually dig a fire line wide enough to stop a very powerful, fast-moving fire. And so firing operations are just a way to make a wider containment line. So the teams had been mentioning the need to perform potentially firing operations to slow the fire down because it was roaring north at that point. It was getting, it was kind of picking up steam. Before the fire got to Mr. O'Grady's property, the firefighting teams had laid down a line of fire retardant just south of his section, still on Forest Service land, in an attempt to slow it if it did actually progress that far to the north. It did. It got there. It jumped that fire retardant line and it entered Mr. O'Grady's property first on or about the 10th or 11th of August. The firefighting teams did not conduct firing on Mr. O'Grady's property at that point, even though they were probably justified to do so because it was threatening Forest Service property and other private property at that point. The fire continues to move across Mr. O'Grady's property on the 12th and the 13th and the 14th. It's spotting onto his property. It's now likely to go onto private property further to the north of his property. And it's at that point, on the afternoon of the 14th, that the firefighting teams say, hey, we need to do some firing here to try and blunt this thing. And so they had been talking about the potential need to slow the fire down and to bring it down more gently through the use of firing operations for days in advance of doing it. And Mr. O'Grady testified at his deposition that he was taking a look. He was monitoring InsaWeb consistently. And so he's reading the updates. I don't know if maybe it didn't sort of land with him what was going on, but those InsaWeb updates, importantly, provide links to the Facebook page that the firefighting teams had set up. They provided information related to the hotline that he could have called. They provided the email address that was, it was like lolopeakfire at gmail.com or something like that. QR code to scan to get information. All these different ways that he could have called and said, hey, what's going on here? But his expectation was that because they had his number among hundreds of other numbers of folks that were just sort of had an interest in what was happening, because they had his number, they should have called him. And that's just not the law. That's not the law. That's not what the incident decision says. It doesn't say you must call these people within the worst case scenario fire boundary that I mentioned a moment ago. I want to touch quickly. That really, most of that, I'd say, has a lot to do with, I think, the first prong of the discretionary function analysis. And I want to touch quickly on the second prong, which is susceptibility to policy analysis. Actually, so the first prong being the mandatory language, the second prong being susceptibility to policy analysis. As I read Esquivel, I think that Esquivel establishes that communications based upon the performance of suppression operations are per se susceptible to policy analysis on account of Miller, that extension of Miller to communications. But I think, irrespective of Esquivel, if you back up from that per se analysis and just perform the traditional, is it subject to competing policy considerations, I think the answer is yes. And the communications are susceptible to policy analysis here. I'd point the court to the declarations of the public information officers from the two firefighting teams. Those are at ER 53 to 76 and SER 25 to 76. It's clear from those declarations that there is a weighing of competing economic and social policy considerations in sort of arriving at a communication strategy, communicating with the public about a wildfire during a wildfire. And those officers discuss the considerations that go into that strategy, like the size and characteristics of surrounding communities, the availability of public information staff and communications resources, an important one being the speed at which the fire changes. That has an impact on how the teams choose to communicate with the public and convey information. And then finally, firefighter and even public information staff safety among the considerations that go into coming up with that strategy. Could you explain, what is your view of how to reconcile Green and Esquivel? Sure. I like to think of Green as opening the door. Green said, this record on a motion to dismiss is insufficient to find a susceptibility to policy analysis. Judge McKeon, I think you mentioned a moment ago that Green, despite finding the lack of susceptibility to policy analysis, found that the Forest Service manual provisions at issue were not mandatory. So that's important. But in terms of the second prong, Green said, we're on a motion to dismiss. We have a minimal record. But if the record was further fleshed out and say, for example, we had evidence that there were competing social and economic policy considerations at issue with coming up with a communication strategy, I read Green to say the outcome may have been different if that evidence was in the record. Now to move on to Esquivel, the reconciliation of Green, I think is, A, we have this evidence that there was a susceptibility to policy analysis in terms of the communications-related decisions. And B, the court distinguished Green and Esquivel factually by saying, in Green, there was no evidence of any suppression activity before or after these firing operations. Green's unique because the firefighters didn't know that there was private property there. And they performed this firing operation on the private property without notifying anybody and before the fire had come anywhere close to those properties. In Esquivel, there was suppression operation before and after, suppression actions before and after the communications at issue there. And that's what we have here. We have weeks worth of suppression activity all over the fire area before the firing operations took place on and near O'Grady's property and to the west of the McIntosh Manor properties. And then, of course, there's additional suppression activity after the firing operations. And I see that my time is up, absent further questions. Thank you for your time. I appreciate it. Thank you. Mr. McLean, you have just over two minutes remaining. Thank you very much, Your Honor. I'd like to pick up where Mr. Newman left off, and that is getting us back to considering Greene and Esquivel and how they apply in this case. Generally speaking, Greene determined that failure to notify landowners of firing operations is not susceptible to a policy analysis. Greene did say it was discretionary under the facts of that case. Here we're arguing we have a very large record that shows notice of firing operations was not discretionary based on the decisional documents of the U.S. Forest Service themselves. But if the court disagrees with that assessment, the government still has to show that their communication policy and strategy and failure to notify our clients in this case is susceptible to a policy analysis. And they have completely failed in that regard. They've attached a foothold high of communications that say basically nothing to any of our clients. They say nothing about firing operations. And it's always interesting to listen to government counsel argue and build up the drama of the events of August 16th and this fire blowing up and creating large problems. That's what they want to talk about because it's dramatic. And it talks about firefighter courage. We don't disagree with that. What our problem is is that they knew on August 10th that the fire was approaching McIntosh to notify them. Then they go for another week. Every day. They're sending information back to headquarters saying, oh, Grady's property is on fire. Oh, Grady's property is on fire. That fire is going to approach McIntosh Manor. They document on August 11th and 12th. It's coming to McIntosh Manor. But they do not give an evacuation warning. They do nothing until August 16th of that night when they give an evacuation order to the McIntosh Manor plaintiffs. That is a failure to notify and it's not susceptible to a policy analysis. The government cannot hide behind the discretionary function in this case because it's completely failed its obligations to our clients. And I would direct the court. I know you've already read our factual recitation, but we lay out for you in detailed citations to the record day-by-day actions by the Forest Service, day-by-day statements by the Forest Service showing that they knew that that fire had the propensity to approach our client's property that was actually burning Brian O'Grady's property and they completely failed to notify them. And if that's discretionary, they still have to get over the fact that under the proper discretionary function analysis, they have to show that it's susceptible to a policy analysis and they have not. Thank you very much, Your Honors. I do appreciate your consideration and your questions. Thank you. Thank you, counsel. We thank both sides for their helpful arguments this morning and the cases submitted. That concludes our calendar for the day.
judges: McKEOWN, MILLER, THOMAS